IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF UTAH, NORTHERN DIVISION

| | |
|---|---|
| MICHAEL R. PICKERING,<br><br>Plaintiff,<br><br>v.<br><br>EQUITABLE FINANCIAL LIFE INSURANCE COMPANY OF AMERICA,<br><br>Defendant. | **MEMORANDUM DECISION AND ORDER ON MOTIONS FOR SUMMARY JUDGMENT**<br><br>Case No. 1:25-cv-00046<br><br>Judge Tena Campbell<br>Magistrate Judge Daphne A. Oberg |

Before the court are the parties' cross-motions for summary judgment. (Def.'s Mot. Summ. J., ECF No. 19; Pl.'s Mot. Summ. J., ECF No. 20.) For the reasons stated below, the court denies the Defendant's motion and grants in part and denies in part the Plaintiff's motion.

**BACKGROUND**

Plaintiff Michael R. Pickering seeks Long Term Disability benefits under the North Atlantic Imports group employee welfare benefits plan (the Plan). North Atlantic Imports sponsors a Group Disability Income Insurance policy (the Policy) through Defendant Equitable Financial Life Insurance Company of America (Equitable). (See Policy, ECF No. 18-3.) Equitable is the claims administrator responsible for making Long Term Disability benefits determinations under the Plan. The Plan is governed by the Employment and Retirement Income Security Act of 1974, 29 U.S.C § 1001 et seq. (ERISA).

The Policy defines "Disability or Disabled" to mean that "in a particular month, You satisfy either the Occupation Test or the Earnings Test, as described below. You may satisfy both

the Occupation Test and Earnings Test, but You need to only satisfy one Test to be considered Disabled." (ECF No. 18-3 at 20.)[1] The Earnings Test states:

> You may be considered Disabled in any month in which You are actually working, if You are prevented by accidental bodily injury, sickness, Mental Illness, Substance Abuse or pregnancy from earning more than 80% of Your Indexed Pre-disability Earnings in that month in Any Occupation. After You have been Disabled for 12 consecutive months, We will use Your Indexed Pre-disability Earnings to decide whether You are Disabled under this test.

(Id. at 20–21.) And the Occupation Test states that someone is Disabled if,

> 1) during the first 24 months of a period of Disability (including the Elimination Period), You are unable to perform one or more of the Essential Duties of Your Own Occupation; and
>
> 2) after 24 months of Disability, You are unable to perform one or more of the Essential Duties of Any Occupation.

(Id. at 20.)

A few additional definitions are necessary to understand the Occupation Test. First, the Policy defines "Essential Duty" as "a duty that, in Our determination: 1) is substantial, not incidental; 2) is fundamental or inherent to the occupation; and 3) cannot be reasonably omitted or changed. Your ability to work the number of hours in Your regularly scheduled workweek is an Essential Duty." (Id. at 21.) Next, "Your Own Occupation" means "your occupation as it is recognized in the general workplace. Your Occupation does not mean the specific job you are performing for a specific employer or at a specific location." (Id. at 24.) And "Any Occupation" means "any occupation for which You are qualified by education, training or experience, and that has an earnings potential greater than the lesser of: 1) the product of Your Indexed Pre-disability Earnings and 80%; or 2) the Maximum Monthly Benefit." (Id. at 20.)

---

[1] Citations are to PDF exhibit pages, not internal document pages.

The Policy also has a provision limiting the duration of benefits for a disability caused by mental illness to only

> 1) for as long as You are confined in a hospital or other place licensed to provide medical care for the disabling condition; or,
>
> 2) if not confined, or after you are discharged and still disabled, for a total of 24 months for all such disabilities during your lifetime.

(Id. at 28.)

Mr. Pickering worked in the warehouse for North Atlantic Imports from 2017 to 2022. (See Long Term Disability Income Benefits Questionnaire, ECF No. 18-2 at 181.) He claimed disability because of "congestive heart failure," "COPD," and "hypertension." (See Claimant Questionnaire, ECF No. 18-2 at 60.) Equitable initially granted Long Term Disability benefits to Mr. Pickering, effective May 3, 2022. (See Letter Granting Benefits, ECF No. 18-1 at 85–89.) But on May 16, 2024, after Equitable switched from applying the "Your Occupation" standard to the "Any Occupation" standard at the 24-month mark under the Occupation Test, Equitable terminated benefits. (See Letter Terminating Benefits, ECF No 18-1 at 136–41.) Equitable explained that it was terminating benefits because Mr. Pickering was unable to satisfy the Any Occupation standard. (Id.) After reviewing Mr. Pickering's medical records and the notes from his providers, Equitable found that "the medical information on file supports the ability to perform full-time sedentary work." (Id. at 138.)

Equitable's decision relied on an Employability Analysis Report conducted by a Vocational Rehabilitation Clinical Case Manager using Occupational Access System, a "computerized job matching system that cross references an individual's qualifications profile with 12,741 occupations classified by the U.S. Department of Labor in the 1991 Dictionary of Occupations Titles (DOT)." (See Employability Analysis Report, ECF No. 18-1 at 270;

Employability Analysis Report, ECF No. 18-2 at 1–22; ECF No. 18-1 at 139.) Considering Mr. Pickering's experience as a laborer in stores, an industrial-truck operator, and a mate of a fishing vessel, the Employability Analysis Report found two occupations that were a "fair" match for Mr. Pickering and 22 that were a "potential" match. (ECF No. 18-2 at 1.) The Transferability Table included in the Employability Analysis Report noted that occupations with a "fair" or "potential" level of transferability required additional training in "Tools and/or Materials" and "Tools and Materials," respectively. (Id. at 6.) Representative roles listed in the Employability Analysis Report that met Mr. Pickering's profile included escort vehicle driver, eyeglass frames inspector, sorter, preparer, compact assembler, and table worker. (Id. at 2.)

Some of the occupations that were identified as matches were eliminated because they required skills or abilities Mr. Pickering did not possess or because they were not readily available. (See id. at 1–2.) In particular, the Employability Analysis Report excluded occupations that were a "fair" or "potential" match but had Specific Vocational Preparation levels of 4 and above. (Id. at 2.) A later clarification explained that "[a]lthough the occupations identified in the Employability Analysis [Report] have a[] [Specific Vocational Preparation] level of 2 or 3[,] they would only require short-term on-the-job training (30 days up to 3 months). Mr. Pickering would be able to perform all of the identified occupations without prior experience." (Suppl. Vocational Report, ECF No. 18-1 at 8.)

The Employability Analysis Report relied on a comprehensive Medical Case Manager review dated May 14, 2024. (See ECF No. 18-1 at 270.) The Medical Case Manager report noted that Dr. Carr, one of Mr. Pickering's doctors, stated that he "didn't feel that Mr. Pickering would be capable of performing sedentary work based on anxiety issues and lack of social skills." (Id.) But the Medical Case Manager report found that "no cognitive testing has been

completed and there was no mention of mental health treatment or care within the medical records." (Id.)

Dr. Carr provided this statement in response to a letter from Equitable requesting additional information to help Equitable assess Mr. Pickering's claim for Long Term Disability benefits. (Dr. Carr Letter, ECF No. 18-2 at 52.) In the letter, Equitable acknowledged that Mr. Pickering suffered from cardiac and pulmonary conditions but expressed that it was "unclear" why Mr. Pickering could not perform full-time sedentary work. (Id.) The letter specifically asked Dr. Carr to provide a "yes" or "no" answer to the question of whether Mr. Pickering could perform full-time sedentary work and an explanation for the answer selected. (Id.) Dr. Carr answered "no," explaining: "Michael has ongoing problems with mental health. In my opinion his anxiety, cognitive status, and social skills impair his ability to work in a sedentary position." (Id.) Dr. Carr sent his response to Equitable on May 9, 2024, and Equitable issued the Employability Analysis Report only six days later on May 15, 2024. (Id.; ECF No. 18-1 at 270.)

On November 11, 2024, Mr. Pickering appealed the termination of benefits. (See Appeal, ECF No. 18-1 at 177–79.) The appeal focused on perceived flaws in the Employability Analysis Report mischaracterizing Mr. Pickering's past work and associated skills. (See id. at 177–78.) Equitable sent Mr. Pickering a letter containing an Employability Analysis Report Clarification on November 19, 2024. (Employability Analysis Report Clarification Letter dated Nov. 19, 2024, ECF No. 18-1 at 150.) In response, Mr. Pickering sent a letter on November 26, 2024, further criticizing the representations of Mr. Pickering's work experience and skills in the Employability Analysis Report Clarification. (See Comments Letter, ECF No. 18-1 at 168–69.) This letter included a statement from Mr. Pickering detailing his past work experience. (See

Pickering Statement, ECF No. 18-1 at 171.) Equitable sent Mr. Pickering another Employability Analysis Report Clarification on December 10, 2024. (See Employability Analysis Report Clarification Letter dated Dec. 10, 2024, ECF No. 18-1 at 152.) And on December 12, 2024, Equitable completed its review of Mr. Pickering's appeal and affirmed its decision to deny benefits. (See Letter Affirming Appeal, ECF No. 18-1 at 154–160.)

**LEGAL STANDARD**

Under Federal Rule of Civil Procedure 56(a), "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In an ERISA case, when the parties have both moved for summary judgment and effectively stipulated that no trial is necessary, "summary judgment is merely a vehicle for deciding the case[.]" See LaAsmar v. Phelps Dodge Corp. Life, Accidental Death & Dismemberment & Dependent Life Ins. Plan, 605 F.3d 789, 796 (10th Cir. 2010) (citation omitted). In these cases, "the factual determination of eligibility for benefits is decided solely on the administrative record, and the non-moving party is not entitled to the usual inferences in its favor." Id. (citation omitted).

In an ERISA denial of benefits action, the court must determine what standard of review applies to a plan administrator's denial of benefits. The Supreme Court has stated that "a denial of benefits challenged under [ERISA] … is to be reviewed under a de novo standard unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan." Firestone Tire & Rubber Co. v. Bruch, 489 U.S. 101, 115 (1989). When a plan administrator has this discretion, the court "review[s] the denial of benefits under an arbitrary and capricious standard." D.K. v. United Behav. Health, 67 F.4th 1224, 1235 (10th Cir. 2023) (citation omitted).

While acknowledging that the Policy grants this discretion to Equitable, the parties contend that the court should apply the de novo standard because the provision is unenforceable under Utah Law. See Utah Code Ann. § 31A-21-314(2)(d) (prohibiting a policy for life insurance or accident and health insurance from reserving discretionary authority). Since the parties have agreed that the de novo standard applies, the court does not need to determine whether Utah's ban on discretionary language applies to this matter.

"When reviewing an administrator's denial de novo, 'the standard is not whether 'substantial evidence' or 'some evidence' supported the administrator's decision; it is whether the plaintiff's claim for benefits is supported by a preponderance of the evidence based on the district court's independent review.'" R.E. v. Blue Cross Blue Shield of Ill., No. 2:22-cv-00296-RJS-DBP, 2023 WL 8936274, at *5 (D. Utah Dec. 27, 2023) (quoting Niles v. Am. Airlines, Inc., 269 F. App'x 827, 833 (10th Cir. 2008)). And the court may consider "only 'those rationales that were specifically articulated in the administrative record as the basis for denying the claim.'" Spradley v. Owens-Illinois Hourly Emps. Welfare Ben. Plan, 686 F.3d 1135, 1140 (10th Cir. 2012) (quoting Flinders v. Workforce Stabilization Plan of Phillips Petroleum Co., 491 F.3d 1180, 1190 (10th Cir. 2007)).

## ANALYSIS

Mr. Pickering argues that Equitable's denial of Long Term Disability benefits was improper because 1) Mr. Pickering cannot perform "Any Occupation" as defined in the Policy, and 2) Equitable's denial of benefits ignored evidence of Mr. Pickering's mental condition. Mr. Pickering also asks the court for prejudgment interest and attorneys' fees. For its part, Equitable claims that it correctly denied benefits after carefully reviewing all evidence.

## I. Whether Mr. Pickering Satisfies the Policy's "Any Occupation" Requirement

The parties agree that Mr. Pickering met the "Your Occupation" standard under the Occupation Test for twenty-four months. But after twenty-four months, the Policy required Mr. Pickering to satisfy the "Any Occupation" standard. (ECF No. 18-3 at 20.) In its decision terminating benefits and when affirming that decision following Mr. Pickering's appeal, Equitable found that Mr. Pickering was unable to meet the "Any Occupation" standard because he could perform full-time sedentary work. (See ECF No. 18-1 at 138, 157–59.) Mr. Pickering argues that this decision is incorrect for the reasons discussed.

### A. "Fair" or "Potential" Transferability

As Mr. Pickering notes, the Employability Analysis Report used the Occupational Access System, a "computerized job matching system that cross references an individual's qualifications profile with 12,741 occupations classified by the U.S. Department of Labor in the 1991 Dictionary of Occupations Titles (DOT)." (ECF No. 18-1 at 270.) The Employability Analysis Report identified two occupations that were a "fair" match for Mr. Pickering and twenty-two that were a "potential" match. (ECF No. 18-2 at 1.) The Transferability Table included in the Employability Analysis Report explained that occupations with a "fair" or "potential" level of transferability required additional training in "Tools and/or Materials" and "Tools and Materials," respectively. (See id. at 6.) Mr. Pickering argues that because additional training is required, he is not qualified for the identified jobs and therefore satisfies the "Any Occupation" standard under the Policy. (See ECF No. 20 at 8–9.)

Other courts have considered similar arguments. In Lamb v. Hartford Life and Accident Insurance Company, a case from the Middle District of Georgia, the Plaintiff argued that he satisfied the "any occupation" requirement of a policy because the five jobs identified in the

Employability Analysis Report were only "fair" matches requiring training and therefore "did not fit within the present tense definition of 'any occupation.'" 862 F. Supp. 2d 1342, 1351 (M.D. Ga. 2012). The court found this argument to be "without merit" because:

> The definition of "any occupation" includes the phrase "for which You are qualified by education, training, or experience." The Policy clearly contemplates a situation when a beneficiary would need to undergo some training to be qualified to perform a new job. Thus, the requirement of having to complete some training does not disqualify the five occupations listed on the [Employability Analysis Report] from being matches for Plaintiff.

Id. (internal citation omitted). The Policy in this matter includes identical language in its definition of "Any Occupation." (See ECF No. 18-3 at 20.)

In another relevant case, the court considered whether an Employability Analysis Report identifying occupations that would require additional training on tools and materials was inconsistent with defining "Any Occupation" as an occupation for which the claimant was "qualified by education, training, or experience[.]" Jackson v. Hartford Life & Accident Ins. Co., No. 2:22-CV-3955, 2024 WL 3218236, at *10 (S.D. Ohio June 28, 2024) (citation omitted). In finding that there was no inconsistency, the court emphasized the role that "or" played in the quoted language, reasoning that "[t]he 'or' is disjunctive—meaning, an occupation for which Ms. Jackson is qualified by education or experience alone satisfies the definition." Id. In other words, it cannot be the case that a claimant must also be qualified through previous training when the claimant is independently qualified for an occupation through adequate education or experience.

The Jackson court's interpretation of this language is compelling. "Courts review ERISA claims as they would any other contract claim by looking to the terms of the plan and other evidence of the parties' intent." Cardoza v. United of Omaha Life Ins. Co., 708 F.3d 1196, 1203 (10th Cir. 2013) (citation modified). And "[l]anguage is to be given its common and ordinary

meaning as a reasonable person in the position of the [plan] participant ... would have understood the words to mean." Hickman v. GEM Ins. Co., 299 F.3d 1208, 1212 (10th Cir. 2002) (citation modified). Given the use of "or" in the definition of "Any Occupation," the proper reading of the definition is that someone who lacks some training could nevertheless be qualified for a particular occupation based on their education or experience.

An additional factor strengthening the comparison between Jackson and this case is the treatment of Specific Vocational Preparation levels. In Jackson, the court noted that the Specific Vocational Preparation level was adjusted downward "to account for [the plaintiff's] limited education and experience, thus 'ensur[ing] occupations requiring short demonstration only were considered.'" Jackson, 2024 WL 3218236, at *10 (citation omitted). Similarly, the Employability Analysis Report in this matter excluded occupations with a Specific Vocational Preparation level of 4 or above. (See ECF No. 18-2 at 2.) The remaining occupations required only "short-term on-the-job training (30 days up to 3 months)." (Suppl. Vocational Report, ECF No. 18-1 at 8.) These similarities provide further justification for adopting the same conclusion the court reached in Jackson: "That the occupations identified would require some training on materials and tools does not mean that Ms. Jackson's education and experience are insufficient for her to perform the roles." 2024 WL 3218236, at *10.

Mr. Pickering argues that the court should instead follow Bishop v. Aetna Life Insurance Company, 163 F. Supp. 3d 443 (E.D. Ky. 2016) and Curtis v. Hartford Life and Accident Insurance Company, 64 F. Supp. 3d 1198 (N.D. Ill. 2014), two other cases interpreting similar "any occupation" language. The court in Bishop found that because the vocational report identified only occupations requiring additional training, the report could not be the basis for the plan administrator's finding that there were jobs for which the plaintiff was qualified by

education, training, or experience. 64 F. Supp. 3d at 451–52. Similarly, the court in Curtis reasoned that "[a]n occupation requiring an employer to develop a plan in order to train [the claimant] is not one for which [the claimant] already is qualified." 64 F. Supp. 3d at 1221. Ultimately, the court in Curtis found that the claimant was not qualified for the jobs identified in the Employability Analysis Report requiring between one and three months of training. Id. at 1222.

Relying on Curtis and Bishop, Mr. Pickering urges the court to find that he cannot be qualified for any job that requires additional training. But the court is not bound by these decisions and declines to adopt their reasoning, as such a holding would contradict the common sense understanding of what it means to be qualified for an occupation. Indeed, many individuals who are hired for positions because they are qualified still must complete on-the-job training before they can begin their work. And, in the extreme, holding that any amount of required training would disqualify Mr. Pickering from an occupation could result in something as negligible as a fifteen-minute training session disqualifying Mr. Pickering from a position.

The court finds that a reasonable amount of required training does not disqualify Mr. Pickering from an occupation. Here, the Employability Analysis Report excludes occupations with a Specific Vocational Preparation level of 4 or above and specifies that Mr. Pickering can perform the remaining identified occupations with training taking "30 days up to 3 months." (ECF No. 18-1 at 8; ECF No. 18-2 at 2.) The court finds that this amount of required training os reasonable and rejects Mr. Pickering's argument that he is not qualified for occupations that are a "fair" or "potential" match and require additional training.

### B. Timing of Analysis

Mr. Pickering contends that to qualify for Long Term Disability benefits, he need only meet the requirements of the "Any Occupation" test at the time the test is triggered. (See ECF No. 20 at 9–11.) Since all of the jobs listed in the Employability Analysis Report require additional training, he argues that it was impossible for him to be qualified for any of these jobs at the time the "Any Occupation" standard was activated after twenty-four months of receiving Long Term Disability benefits. (See id.)

This argument is closely connected to the position rejected above, as Mr. Pickering again urges the court to find that he cannot be qualified for a job that requires additional training. For the reasons stated, the court again declines to find that any amount of required training automatically disqualifies Mr. Pickering from an occupation.

### C. Estimation of Skills

According to Mr. Pickering, the Employability Analysis Report and Employability Analysis Report Clarification improperly inflated his skills when evaluating the suitability of other occupations. (See ECF No. 20 at 12.) The parties agree that the initial analysis conducted in the Employability Analysis Report was based on Mr. Pickering's identification of his past work. After reading the Employability Analysis Report, Mr. Pickering provided a letter on November 7, 2024, correcting some of the representations of his past work. (See ECF No. 18-1 at 171.) But Mr. Pickering argues that his commentary was ignored and the Employability Analysis Report Clarification continued to rely on misrepresentations of his past work. (See ECF No. 20 at 12.) For example, Mr. Pickering notes that his past work in a warehouse only involved cleaning the warehouse, but this experience was still identified with "Laborer Stores,"

an occupation requiring handling, stocking, distributing, or transporting materials. (See id. at 13.)

The Tenth Circuit has cautioned against relying on generalized occupational labels rather than claimant-specific duties. See Bishop v. Long Term Disability Income Plan of SAP Am., Inc., 232 F. App'x 792, 795 (10th Cir. 2007) (requiring the administrator to consider the claimant's "actual job duties in defining 'his occupation'"). But the court finds that Equitable sufficiently tailored Mr. Pickering's profile in the Employability Analysis Report to match the actual skills he possessed from past work. Indeed, the Employability Analysis Report included a lengthy "Profile Adjustments and Considerations" section that attempted to more narrowly match Mr. Pickering's profile with his past skills and experience. (See ECF No. 18-2 at 1.)

**D. Age**

Mr. Pickering argues that the Employability Analysis Report is flawed because it does not take into account his age. (See ECF No. 20 at 14–15.) For support, Mr. Pickering notes that the Commissioner of Social Security has a regulation that takes age into account when assessing the transferability of skills for workers over the age of fifty-five. (See id. at 15.) But Social Security regulations do not govern ERISA proceedings. Indeed, Social Security proceedings "are entirely different and separate from a claim under ERISA, with different parties, different evidentiary standards, and different bodies of law governing their outcomes." Wagner-Harding v. Farmland Indus. Inc. Employee Ret. Plan, 26 F. App'x. 811, 817 (10th Cir. 2001). The court accordingly declines to find that the Employability Analysis Report is required to address Mr. Pickering's age.

## II. Equitable's Treatment of Evidence of Mr. Pickering's Mental Condition

Mr. Pickering argues that Equitable's decision to deny benefits is flawed because Equitable ignored evidence of Mr. Pickering's mental condition and associated treatment. (See ECF No. 20 at 16–22.) For its part, Equitable argues that Mr. Pickering improperly raised this argument for the first time in this litigation. (See Def.'s Reply, ECF No. 23 at 14.) Moreover, Equitable claims that the Employability Analysis Report properly reviewed the full record and that the Policy limits Long Term Disability due to mental illness to a maximum of 24 months, making it impossible for Mr. Pickering to receive additional benefits. (See id. at 13–14.)

### A. Equitable's Failure to Consider Evidence of Mr. Pickering's Mental Condition

Mr. Pickering argues that Equitable's decision to deny benefits was based on a Medical Case Manager review that contradicts the record. (ECF No. 20 at 16.) While acknowledging that Dr. Carr, one of Mr. Pickering's doctors, stated that he "didn't feel that Mr. Pickering would be capable of performing sedentary work based on anxiety issues and lack of social skills," the Medical Case Manager review "noted that no cognitive testing has been completed and there was no mention of mental health treatment or care within the medical records." (ECF No. 18-1 at 270.) But the record on multiple occasions addresses Mr. Pickering's anxiety disorder as well as associated treatments and medications. (See Medical Records, ECF No. 18-2 at 51, 131, 135, 159, 168.) Since Equitable's denial of benefits was based on the Employability Analysis Report, and the Employability Analysis Report was based on a Medical Case Manager review that disregarded evidence of Mr. Pickering's mental condition, Mr. Pickering argues that the denial of benefits was flawed.

Equitable responds that the Employability Analysis Report analyzed the full record and was not required to accept Dr. Carr's conclusory statement that Mr. Pickering's mental condition

would prevent him from performing sedentary work. (ECF No. 23 at 13.) But the Employability Analysis Report states that "[t]he functional capabilities used in this analysis are based on the comprehensive Medical Case Manager review completed on 5/14/24." (ECF No. 18-1 at 270.) While the Employability Analysis Report claims that the Medical Case Manager review included a "thorough review of the file," the Medical Case Manager review missed all evidence of mental health treatment and care in the record. (Id.) And part of the reason why the Medical Case Manager rejected Dr. Carr's opinion was because of the purported lack of evidence of Mr. Pickering's mental health treatment. (Id.)

Plan administrators are required to provide a "reasonable opportunity to any participant whose claim for benefits has been denied [to receive] a full and fair review ...." Robert B. v. Premera Blue Cross, 701 F. Supp. 3d 1153, 1171 (D. Utah 2023) (quoting D. K. v. United Behav. Health, 67 F.4th 1224, 1236 (10th Cir. 2023)). "While administrators need not defer to the opinions of a beneficiary's treating physicians, reviewers 'may not arbitrarily refuse to credit such opinions if they constitute reliable evidence from the claimant.'" Id. at 1171–72 (quoting D.K., 67 F.4th at 1237). Instead, administrators must "engage with medical opinions in health benefit claims." D.K., 67 F.4th at 1239.

When an administrator's process is procedurally deficient, the court "may either remand the case to the plan administrator for a renewed evaluation of the claimant's case or [it] may order an award of benefits." Weber v. GE Grp. Life Assur. Co., 541 F.3d 1002, 1015 (10th Cir. 2008) (citation omitted). "An award of benefits is appropriate 'if the evidence in the record clearly shows that the claimant is entitled to benefits.'" R.E., 2023 WL 8936274, at *13 (quoting Carlile v. Reliance Standard Life Ins. Co., 988 F.3d 1217, 1229 (10th Cir. 2021)). "But, if the plan administrator failed to make adequate findings or to explain adequately the grounds of its

decision, the proper remedy is to remand the case to the administrator for further findings or explanation." Id. (citation modified).

The Tenth Circuit has found remand to the administrator to be an appropriate course of action when the administrator ignored relevant evidence in making its decision. See Rekstad v. U.S. Bancorp, 451 F.3d 1114, 1121 (10th Cir. 2006). In so doing, the Tenth Circuit explained, "[W]e are not convinced that [the administrator] would arrive at its previous conclusion once full and thorough consideration is given to all relevant evidence. And we will not substitute our judgment for that of [the administrator]." Id. Here, it is similarly unknown what outcome Equitable would reach after considering evidence of Mr. Pickering's mental condition. Accordingly, the court remands Mr. Pickering's claim for benefits to Equitable for proper consideration.

**B. Mr. Pickering's Argument is Permissible at this Stage**

The Tenth Circuit "has recognized an exhaustion rule for ERISA claims derived not from an explicit statutory directive but from 'ERISA's overall structure of placing primary responsibility for claim resolution on fund trustees.'" Farr v. Hartford Life & Acc. Ins. Co., 322 F. App'x 622, 627 (10th Cir. 2009) (quoting McGraw v. Prudential Ins. Co. of Am., 137 F.3d 1253, 1263 (10th Cir. 1998)). Accordingly, the Tenth Circuit has "applied a rule barring ERISA claims that were not previously pursued administratively (i.e., claim exhaustion)." Id. at 628. But the Tenth Circuit has "not extended this rule to bar subsidiary arguments urged on judicial review in support of a claim itself fully exhausted in the administrative process (i.e., issue exhaustion)." Id.

Equitable argues that Mr. Pickering's arguments are improper at this stage because they are raised for the first time in his motion. For support, Equitable cites cases that instead prevent

the plan administrator from raising post-hoc rationalizations for denying benefits. (See ECF No. 23 at 12–13.) These cases are not on point. Under the Tenth Circuit practice outlined in Farr, Mr. Pickering can raise new arguments supporting his exhausted claim at this stage. See Farr, 322 F. App'x at 628.

Moreover, Dr. Carr previously informed Equitable that Mr. Pickering's mental condition impaired his ability to perform full-time sedentary work. On May 9, 2024, Equitable sent a letter to Dr. Carr requesting additional information to help Equitable assess Mr. Pickering's claim for Long Term Disability benefits. (ECF No. 18-2 at 52.) In the letter, Equitable expressed confusion about why Mr. Pickering's physical conditions would prevent him from performing full-time sedentary work. (Id.) The letter specifically asked Dr. Carr to provide a "yes" or "no" answer to the question of whether Mr. Pickering could perform full-time sedentary work and an explanation for the answer selected. (Id.) Dr. Carr answered "no" and gave the following explanation: "Michael has ongoing problems with mental health. In my opinion his anxiety, cognitive status, and social skills impair his ability to work in a sedentary position." (Id.) Equitable issued the Employability Analysis Report only six days later days later. (ECF No. 18-1 at 270.) Although Mr. Pickering had not previously raised based on his mental condition, Equitable already had knowledge that Mr. Pickering's mental condition impacted his ability to perform full-time sedentary work.

### C. The Policy Allows for Additional Benefits Based on Mr. Pickering's Mental Condition

The Policy limits the duration of benefits for someone being disabled "because of" mental illness to only

> 1) for as long as You are confined in a hospital or other place licensed to provide medical care for the disabling condition; or,

> 2) if not confined, or after you are discharged and still disabled, for a total of 24 months for all such disabilities during your lifetime.

(ECF No. 18-3 at 28.) Equitable argues that since Mr. Pickering received twenty-four months of Long Term Disability benefits, he "could not receive any additional benefits even if he was unable to perform Any Occupation due to a mental condition." (ECF No. 23 at 14.)

Mr. Pickering replies that "the 24 month mental health limitation was never triggered during Pickering's initial 24 month period of disability under the 'Own Occupation' standard; therefore, as of the date the 'Any Occupation' clause became operable, the entire 24 month mental health limitation period was still available to Pickering." (Pl.'s Reply, ECF No. 29 at 3.) While Mr. Pickering does not provide much detail expounding on this reasoning, his argument appears to posit that since consideration of Mr. Pickering's mental health was not necessary for him to satisfy the Occupation Test while the test used the "Your Occupation Standard," he was not disabled "because of" his mental illness during this time. Accordingly, Mr. Pickering urges the court to find that the twenty-four-month period during which he received Long Term Disability benefits while the "Your Occupation" standard was being applied should not bar Mr. Pickering from now receiving up to twenty-four months of Long Term Disability benefits.

When Mr. Pickering applied for benefits, he identified only "congestive heart failure," "COPD," and "hypertension" as his current medical conditions. (See Claimant Questionnaire, ECF No. 18-2 at 60.) Since Mr. Pickering received Long Term Disability benefits without mentioning mental conditions, it would not be logical to say that he qualified as disabled "because of" any mental condition. The language "because of" indicates that for the clause to be triggered, a mental illness must play a causal role in Mr. Pickering qualifying as disabled. Such an interpretation is just. Indeed, an incidental mental condition should not limit the duration of

benefits granted for a physical condition. Accordingly, Mr. Pickering has not exhausted the potential twenty-four-month period of benefits based on mental illness.

**III. Prejudgment Interest and Attorneys' Fees**

Because remand, rather than an award of benefits, is the appropriate remedy, the court declines to award prejudgment interest at this time. See R.E., 2023 WL 8936274, at *13 (citation omitted). For similar reasons, the court declines to decide whether to award attorneys' fees. See Graham v. Hartford Life And Accident Ins. Co., 501 F.3d 1153, 1162 (10th Cir. 2007) ("At this point in the litigation, however, a decision regarding attorney's fees is premature. The district court cannot properly apply the five-factor Gordon test, particularly with respect to the merits of the parties' positions and the impact of the litigation on other beneficiaries, when it remains to be seen whether Graham is entitled to benefits under the plan.").

**ORDER**

For the foregoing reasons, the court ORDERS as follows:

1. The Defendant's Motion for Summary Judgment is DENIED. (ECF No. 19.)

2. The Plaintiff's Motion for Summary Judgment is GRANTED in part and DENIED in part. (ECF No. 20.)

3. The Plaintiff's requests for prejudgment interest and attorneys' fees are DENIED.

4. Equitable's denial of benefits is REVERSED and this case is REMANDED to Equitable for further proceedings consistent with this decision.

5. The Clerk of Court is directed to administratively close this case. The court retains jurisdiction and the case may be reopened upon motion by any party after the completion of the review on remand.

DATED this 3rd day of September, 2026.

BY THE COURT:

Tena Campbell
United States District Judge